IN THE UNITED DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CLOUD49, LLC, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 1:22-CV-229-LY |
| RACKSPACE TECHNOLOGY, INC., | § | |
| CAPGEMINI AMERICA, INC., AND | § | |
| SYMBIO ECOSYSTEMS, LLC | § | |
| *Defendants*. | § | |

## PLAINTIFF'S THIRD AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Cloud49 LLC ("Plaintiff" or "Cloud49") files this Third Amended Complaint and Jury Demand against Defendants Rackspace Technology ("Rackspace"), Capgemini America, Inc. ("Capgemini"), and Symbio Ecosystems, LLC ("Symbio") (collectively, the "Defendants"), and would respectfully show the following:

## I. PRELIMINARY STATEMENT

1.      This case involves a plot by Rackspace, Capgemini, and Symbio to manipulate a state agency – the Department of Information Resources ("DIR") – into awarding a public contract worth hundreds of millions of dollars to Rackspace instead of Plaintiff. In the years leading up to the award of the contract, Plaintiff had successfully performed the public cloud management activities that DIR and other state agencies needed. Capgemini wanted to eject Plaintiff because Plaintiff had shown Capgemini to be incompetent and because Capgemini would obtain more fees if the functions were transitioned to a new provider. Similarly, Symbio stood poised to gain if a transition occurred. Rackspace was happy to conspire with Capgemini and Symbio to undermine the competitive bidding process in its favor, and Capgemini and

Symbio were willing to turn a blind eye to Rackspace's need to steal Plaintiff's confidential information to make a transition actually work.

2.     Plaintiff brings this suit to recover damages for the wrongful conduct of the Defendants and to expose to public scrutiny the many departures from appropriate competitive bidding practices.

## II. PARTIES

3.     Plaintiff, **Cloud49**, is a Domestic Limited Liability Company (LLC) based out of Austin, Texas.

4.     Defendant **Rackspace Technology, Inc.** is a corporation based out of Windcrest, Texas who has appeared in this case through counsel.

5.     Defendant **Capgemini America, Inc.** is a corporation that has appeared in this case through counsel.[1]

6.     Defendant **Symbio Ecosystems LLC** is a Domestic Limited Liability Company that has appeared in this case through counsel.

## III. JURISDICTION AND VENUE

7.     The District Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States, including specifically the Defend Trade Secrets Act enacted by Congress and as codified in 18 U.S.C. § 1836. Additionally, the District Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334 because this civil proceeding is related to the bankruptcy case filed by Plaintiff, the Debtor in Case No. 22-10085-TMD pending in the United States Bankruptcy Court for the Western District of Texas.   Additionally, to the extent the District Court does not have original

_____

[1] Plaintiff's original petition included CapGemini SE as a party.  This complaint does not include CapGemini SE as a party, and Plaintiff is no longer pursuing its claims against CapGemini SE in this case.

jurisdiction over some of the claims, the District Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.      Neither governmental nor sovereign immunity applies to any of the defendants in this case, as none of the defendants are sovereigns or governmental agencies.  The Supreme Court of Texas has recognized "derivative sovereign immunity;" however the Supreme Court of Texas has held that derivative sovereign immunity does not exist when the complained-of conduct of a government contractor was a discretionary act or omission of the contractor. Rackspace was not acting as a government contractor at the time the majority of the conduct at issue in this suit took place, and Rackspace's inducement of breaches of contract were discretionary and not done at the direction of the government.  Capgemini and Symbio were acting as advisors to government during the time period at issue in this case and their actions set forth below were discretionary rather than done at the direction of the government.  Accordingly, even if the concept of "derivative sovereign immunity" were to be recognized, the concept would be inapplicable to the Defendants in this case.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in Travis County, Texas, which is within the Western District of Texas and the Austin Division.  Additionally, venue is proper in this district because this case was removed pursuant to 28 U.S.C. § 1452, and Plaintiff's bankruptcy case is pending in this district.

### IV.  FACTUAL BACKGROUND

**A.    Prior To The Bidding Process At Issue, Cloud49 Was The Premier Public Cloud Manager For The State Of Texas.**

10.     Plaintiff Cloud49 was a company based out of Austin, Texas engaged in the cloud computing industry.  Prior to the events at issue in this case, Cloud49 had been in business for

almost a decade. Companies like Microsoft, Amazon, and others provide public cloud infrastructure – servers, internet bandwidth, etc. – that allows users to access and use software and data hosted on the public cloud. Public cloud managers serve as middle-men between the public cloud providers and those using cloud infrastructure. For instance, a public cloud manager assists the customer in keeping track of how much data is being stored and which servers it is being stored on as well as providing guidance and projections on future cloud needs.

11.     The State of Texas has extensive information technology needs. Agencies of the State of Texas have the option of contracting directly with service providers but can also choose to contract with the Texas Department of Information Resources ("DIR"), a state agency created by the Legislature for the purpose of providing information technology services to the state. State agencies often prefer to contract with DIR rather than directly with service providers because DIR is more familiar with the needs of state agencies and can provide expertise that state agencies may not have. Additionally, DIR can sometimes obtain more competitive pricing by bundling state agencies together than the state agencies might be able to obtain on their own.

12.     Cloud49's first state contract was not with DIR. The Texas Department of Health and Human Services ("HHS") had elected not to contract with DIR and instead contracted with Cloud49 to perform its data center functions. DIR's data center services contract had been with Xerox State and Local Solutions, Inc. ("Xerox"), and Atos Governmental IT Outsourcing Services, Inc. ("Atos") acquired Xerox (and the DIR contract) in 2015. DIR wanted to win HHS's business (DIR collects a fee from other state agencies for its services) and improve its data center services. DIR and Atos agreed that Atos should subcontract with Cloud49 to perform data center services for DIR.

13.     Thereafter, Cloud49 performed the public cloud management services for DIR for five years.  Through trial and error and investment of resources, Cloud49 developed software, processes, and procedures that streamlined the public cloud process for state agencies.  Cloud49 became one of the most experienced and knowledgeable public cloud managers in the state, and Cloud49's services were well regarded.

**B.      Plaintiff And Rackspace Submitted Bids For The Public Cloud Manager Contract.**

14.     The informational technology needs of the State of Texas continued to grow through the five-year period that Cloud49 worked on behalf of DIR.  Recognizing that growth and the potential conflicts of interests posed by changes in the industry, DIR decided to reorganize how it contracted for data center services.  In particular, in 2019, DIR issued "requests for offers" on seven data center services:  (1) Texas Private Cloud; (2) Managed DCS Network; (3) DCS Security Operations Services; (4) Technology Solutions Services; (5) Public Cloud Manager; (6) Print, Mail, and Digitalization; and (7) Mainframe Services.  Companies that submitted offers for certain services could not submit offers for others.  For instance, Atos sought and ultimately obtained the Texas Private Cloud contract so Atos was prohibited from seeking the Public Cloud Manager Contract.  Thus, Atos and Plaintiff agreed that Plaintiff could seek the Public Cloud Manager Contract without conflicting Atos's objectives.

15.     Capgemini contracted with DIR to serve as the "Multi-sourcing Services Integrator" ("MSI") with responsibility for making sure the services rendered by the various providers would function together in a form usable by DIR's customers (the state agencies).  In this role, Capgemini had access to information being generated by Cloud49 on its existing subcontract with Atos, and Capgemini also participated at every stage of the bidding process for the Public Cloud Manager Contract.  Defendant Symbio contracted with DIR to help oversee and conduct the bidding process on the Public Cloud Manger Contract for DIR.

16.    On October 25, 2019, DIR issued its First Request for Offer ("RFO") on the Public Cloud Manager Contract.  DIR then held a solicitation conference on November 13, 2019, which was attended by thirty-six separate vendors. Both Plaintiff Cloud49 and Defendant Rackspace timely submitted a complete and responsive proposal prior the deadline on January 8, 2020, and DIR performed Historically Underutilized Business and Financial Screenings on both companies.

17.    DIR conveyed to each vendor that they would be graded based on the following criteria: (1) technical solution and service delivery; (2) experience and past performance; (3) transition; and (4) pricing.  The categories were weighted with 45 points for technical solution and service delivery, 30 points for experience and past performance, 20 points for transition, and 5 points for pricing.  After DIR scored the original submitted proposals, Plaintiff Cloud49 received a weighted score of 100.  At the same time, Defendant Rackspace's overall score was 81.95.  Importantly, Cloud49 outscored Rackspace in all four grading criteria, and Plaintiff's proposed bid was approximately $80,698,261 less than Rackspace's bid.

18.    Following the first round of grading, on February 5, 2020, representatives of Capgemini and Symbio met with representatives of Rackspace.  At that point, Rackspace had decisively lost and should have been eliminated from the bidding process.  Rackspace's pricing was $80,698,261 more than Plaintiff's pricing, and Plaintiff had a score of 100 while Rackspace had a score of only 81.95.  For the other contracts being bid at the same time, bidders were eliminated if they deviated more than 10% from the lead bidder.  Rackspace should have been eliminated but instead the three Defendants reached agreement at that meeting that Rackspace would win the contract instead of being eliminated.  The first step in the conspiracy was for

Capgemini and Symbio to advise DIR to conduct a second round of bidding, and based on that improper advice, DIR elected to issue a Request for Revised Offer ("RFO1").

19.     Both Cloud49 and Rackspace submitted revised responses that were each evaluated and scored. Cloud49 again obtained a weighted score of 100 in Round 2 compared to weighted score of 80.20 for Rackspace – a decline for Rackspace compared to the first round. Cloud49's bid was also approximately $113,724,786 less than Rackspace's bid at this time.

20.     Despite the scores being once again overwhelmingly in favor of Cloud49, Capgemini and Symbio persuaded DIR to, once again, ask for additional bids.  Capgemini and Symbio met with Rackspace on or about March 11, 2020.  At that meeting, the three Defendants plotted to eliminate the Microsoft charges from the scope of the bidding and otherwise manipulate the process to allow Rackspace to secure the contract.  Thereafter, DIR issued another Request for Revised Offer on March 17, 2020 ("RFO2").

21.     In this round, Cloud49's score as 92.34 and Rackspace's score was 92.59 – a difference of 0.25 points.  The pricing of Rackspace's offer was radically reduced from its prior offers and was $5,320,630 below Cloud49's final pricing.  Despite the nearly identical scores and radical changes from the prior rounds, Capgemini and Symbio convinced DIR to end the rounds at this point and drop Cloud49 from the bidding process.  DIR then entered negotiations with Rackspace rather than Cloud49.

22.     Rackspace and DIR ultimately entered into the Public Cloud Manager Contract, which was assigned contract number DIR-PCM-MSA-436.  That contract was subsequently amended multiple times and is the largest contract held by Rackspace.  At the time the Public Cloud Manager Contract was awarded to Rackspace, that company had never performed a contract of similar size.

**C.    Plaintiff Lost The Public Cloud Manager Contract Because Of The Misconduct Of Defendants.**

23.    Each of the Defendants stood to gain if Cloud49 lost the bidding process for the Public Cloud Manager Contract.  Rackspace was the only other bidder for the contract and stood to gain tens of millions of dollars in profits if the contract was awarded.  Capgemini and Symbio could earn additional fees if there was a transition between the incumbent provider – Cloud49 – to a new provider – Rackspace.  Additionally, as discussed below, Capgemini had a grievance with Cloud49 because Plaintiff had disclosed to DIR that Capgemini's projections of future data needs and the number of servers currently in use were faulty.

24.    During the bidding process (if not before), the Defendants agreed that they would manipulate the bidding process so that Rackspace would win.  Thereafter, Defendants engaged in numerous acts of misconduct in order to deny Plaintiff a fair bidding process.  None of these acts of misconduct were done at the direction of an employee of DIR or any other state official.

25.    As noted above, based on the scoring method used by DIR, Plaintiff lost the Public Cloud Manager Contract by 0.25 points – a razor thin margin. In the final round, Cloud49 continued to have perfect scores in the Technical Solution and Service Delivery and Transition categories.  Cloud49 lost in the "Experience and Past Performance" category going from a weighted score of 30 in the prior round to a score of 22.76, and Rackspace rose from 25.68 in the prior round to 30 in the final round.  These changes are highly suspicious – Cloud49 was the incumbent provider of the services being bid yet its score went down while a company that had never performed such a contract's scores went up.

26.    Additionally, Cloud49's final pricing was $64,068,753 while Rackspace's final bid was $58,748,123.  Rackspace was given a weighted score of 5 points for having the lowest

bid while Cloud49 received a score of 4.58 – calculated based on the ratio of Rackspace's price divided by Cloud49's price.

27.     If Rackspace had won the "Experience and Past Performance" or "Pricing" categories or simply gotten closer in either category, then Cloud49 would have won the Public Cloud Manager Contract under DIR's scoring method.  As discussed below, the misconduct of the Defendants had an impact on DIR's "Experience and Past Performance" and "Pricing" scores that caused Plaintiff to lose by 0.25 points.

**1.     <u>Misconduct by the Defendants caused Plaintiff's pricing to exceed Rackspace's pricing.</u>**

28.     Microsoft provides software and services that were and are used by customers of DIR.  Microsoft charges for licenses and other fees in connection with its software and services, and the costs of the software and services can become large when purchased in significant volumes as anticipated for future customers of DIR's public cloud services.  In the first two rounds of bidding for the Public Cloud Manager Contract, the costs of certain Microsoft software and services were to be included in the bids, and both Rackspace and Cloud49 included such costs in their pricing.

29.     Sometime between March 12, 2020 (the conclusion of the oral meetings after submissions for RFO1) and March 17, 2020 (the release of RFO2), Capgemini and Symbio convinced DIR to exclude charges for the Microsoft software and services from RFO2.  In particular, Jerry Price of Symbio and Ken Sinclair of Capgemini told Sally Ward of DIR that excluding the Microsoft charges from the contract would help achieve the best value for the State.  Mr. Price and Mr. Sinclair knew that assertion was a misrepresentation and that the opposite was true.  In particular, the Microsoft software and services would still need to be supported by the Public Cloud Manager even if the charges by Microsoft were excluded.  If the

Microsoft software and services charges were included in the contract, then the Public Cloud Manager would not have to charge additionally for the support services (as the cost would be covered as part of the Microsoft charges). By excluding those charges in the Public Cloud Manager Contract, DIR and the customer government agencies would be paying more than necessary.

30.     Jerry Price of Symbio and Ken Sinclair of Capgemini did not care that what they were proposing would harm DIR and the State of Texas. They knew that Rackspace could not beat Cloud49 fairly and changing the terms of the bid would provide Rackspace a way to beat Cloud49. They also knew that DIR would likely end up including the Microsoft software and services charges in the final contract even if the bidding process did not include such charges.

31.     The second request for offers (RFO2), released on March 17, 2020, did not include the Microsoft software and services charges but did include the obligation to support such Microsoft software and services. During a due diligence call, occurring between March 17, 2020 and March 24, 2020, Donnie Gerault, CEO of Cloud49, asked Jerry Price to confirm that Cloud49 would be responsible for supporting Microsoft if awarded the contract. Mr. Price confirmed that the Public Cloud Manager would be responsible for doing so. Mr. Gerault then stated Cloud49 would have to charge for such support if the Microsoft charges were not going to be included in the contract and asked Mr. Price if Cloud49 should assume that the Microsoft charges were going to come back in at the contract stage. Mr. Price then stated that Cloud49 should assume that the Microsoft charges were NOT going to be in the final contract.

32.     Mr. Price knew his statement was false when made, but he made the false statement to induce Cloud49 to submit a higher bid. Indeed, prior to the submission of final bids, Mr. Price or another Symbio employee told Rackspace that the Microsoft charges would be

included in the final contract.  Ultimately, the Microsoft charges were included in the contract between DIR and Rackspace.

33.     Because Rackspace was given truthful information and conspired with CapGemini and Symbio to provide Cloud49 with false information, Rackspace was able to underbid Cloud49.  Indeed, it is clear that Cloud49 relied on Mr. Price's false representation to its detriment.  In its final bid, Plaintiff included charges for Microsoft support services totaling $9,229,032.  Plaintiff would not have included those support charges if it had known that the other Microsoft charges would have been included in the final contract.  The amount that Plaintiff included in reliance on Mr. Price's false statement –  $9,229,032 is greater than the differential between the final two bids –  $5,320,630 – and, therefore, Cloud49 would have won the contract absent Mr. Price and Symbio's fraud.

## 2.     Misconduct by the Defendants caused Rackspace's experience and past performance score to exceed Cloud49's experience score.

34.     As noted above, Cloud49's score for experience and past performance went down and Rackspace's score for experience and past performance went up in the final round of bidding.  If either of those events had not occurred, Cloud49 would have won the Public Cloud Manager Contract.  Both events occurred because of misconduct by Defendants.

35.     Capgemini was responsible for providing DIR with accurate information in connection with the NextGen DCS project.  Of critical importance were information regarding current cloud usage and projected future needs as that information had relevance to the bidding process. In a meeting in DIR's office involving representatives of DIR, Symbio, and Capgemini after the scoring on RFO1 was completed (on or about March 11, 2020), Cloud49 noted that the figures provided by Capgemini to DIR regarding current and future cloud usage were inaccurate and inconsistent with the information maintained by Cloud49.  In particular, Capgemini was

responsible for maintaining the list of service tickets and deployed assets such as the number of servers being used and data at issue. Capgemini and DIR had used Capgemini's numbers when estimating needs for the bidding process on the Public Cloud Manager Contract; however, Capgemini's records were wrong. At the next meeting, Sally Ward of DIR asked Mr. Gerault if Cloud49 had fixed the tracking problem that it had created – although the tracking problem clearly occurred at Capgemini, not Cloud49.

36.     Ken Sinclair of Capgemini had discussed the error in Capgemini's data with Sally Ward between the two meetings and falsely told Ms. Ward that the error originated with Cloud49 rather than from Capgemini's faulty tracking procedures and methods. Mr. Sinclair made the false representation to Ms. Ward as part of the conspiracy of discrediting Cloud49 and steering the contract towards Rackspace.

37.     Ms. Ward scored Cloud49 on experience and past performance in all three rounds. She reduced Cloud49's score in the final round because of Mr. Sinclair (and thus CapGemini's) false statements regarding Cloud49's tracking of current and projected future needs.

38.     Capgemini and Symbio both owed a duty to DIR to contact Cloud49's references and report back to DIR. Indeed, DIR was counting on Capgemini and Symbio to perform that function. However, neither Capgemini nor Symbio contacted Cloud49's references during the procurement process and, thereby, Capgemini and Symbio deprived DIR of feedback from Cloud49's happy customers—the state agencies that DIR serves. When submitting their reports to DIR regarding Cloud49's experience and past performance, Capgemini and Symbio committed fraud by non-disclosure by failing to include information regarding Cloud49's references. Capgemini and Symbio withheld that information from DIR with the intent and purpose of steering the contract away from Cloud49.

39.    Additionally, Rackspace made false statements to DIR about Rackspace's capabilities to boost Rackspace's experience and past performance scores.   Rackspace had operated a private cloud system before but had no experience as a public cloud manager for a governmental agency. For this reason, Rackspace should have been excluded due to its lack of experience in this particular field.  In their meeting on February 5, 2020 (which occurred after the first round of bidding), all three of the Defendants were aware that Rackspace lacked the capabilities of performing the Public Cloud Manager Contract.  The parties discussed the need for Rackspace to better conceal its lack of experience and change its assigned personnel to appear stronger.  However, all Defendants agreed and understood that Rackspace would need to hire Plaintiff's employees and take Plaintiff's confidential information and trade secrets in order to perform the Public Cloud Manager Contract.  Due to this, Defendants chose to mislead DIR by making false statements to DIR regarding Rackspace's capabilities and past experience relative to Cloud49's.

40.    Rackspace conveyed its misrepresentations regarding its experience and capabilities to DIR in its written responses to DIR's requests for offers.  Jason Wicker, an employee acting within the scope of his employment with Rackspace, made the misrepresentations, and the misrepresentations were directly conveyed to Chandra Thompson of the DIR with the expectation that the misrepresentations would be conveyed to other employees of DIR involved in the procurement process.  The misrepresentations were made on or about January 8, 2020, March 5, 2020, and March 24, 2020.  Rackspace claimed to have "proven expertise"; however, Rackspace had never previously engaged or obtained any government contract for public cloud management.  Rackspace's lack of capabilities and experience was too transparent in the initial responses so Capgemini and Symbio advised Rackspace to make

changes.  In its final submission, Rackspace changed the portions of its submission regarding its intended organization, key personnel assignments, and the subcontractors that it intended to use. However, even those representations were false because Rackspace's true plan for addressing its lack of experience and knowhow was to hire Plaintiff's employees and misappropriate Plaintiff's experience and knowhow.

41.     Rackspace should have been eliminated from the bidding process at the end of the first round.  Specifically, based on numerous other state contract bids, a vendor was supposed to be eliminated from the bidding process if the vendor's score deviated more than 10% from the leading bidder.  Rackspace's score after the end of the first (and second) rounds of bidding was far more than 10% less than Cloud49's score.  Capgemini and Symbio chose not to remind DIR of the requirement and proceeded with Rackspace as a bidder in later rounds.

42.     Lawrence Boatwright of Capgemini used Capgemini's position as MSI to obtain sensitive information regarding projected data needs from Cloud49—the incumbent—and shared that information with Rackspace.    Additionally, Lawrence Boatright of Capgemini made numerous requests for information to employees of Cloud49, including Donnie Gerault and Zach Gates, in January and February of 2020 regarding Cloud49's operations and staffing with the stated ostensible purpose of understanding DIR's needs.  In reality, Lawrence Boatwright and Capgemini were collecting information to hand over to Rackspace so that Rackspace could improve its bids in later rounds.  Capgemini knew that Cloud49 would have protested and resisted handing over information if Cloud49 had been informed of the true purpose for Capgemini's requests, and Cloud49 relied on Capgemini's stated ostensible purpose when providing information.

43.    Capgemini and Rackspace met outside the formal bidding process to share information.  One such private meeting between Ken Sinclair of Capgemini and Jason Wicker of Rackspace, was witnessed at a conference during the procurement process of this contract. This contact between Capgemini and Rackspace allowed them to steer the contract to Rackspace.

44.    After the second round, and before the submissions on the third round of bidding, Capgemini shared information about Cloud49's bid and operations with Rackspace, leading to Rackspace completely reformulating its bid. DIR recognized such changes when changing its scoring for the third round with the statement "Rax [Rackspace] has significantly changed their organization, key personnel assignments and subcontractors."  If Capgemini had not shared Cloud49's information, Rackspace likely would not have made such changes.

45.    As a result of the foregoing misconduct by Defendants, Cloud49's experience and past performance score was reduced in the final round and Rackspace's experience and past performance score was inflated.  Because of the close outcome, both the reduction in Cloud49's score and Rackspace's increased score alone would have been sufficient to change the outcome of the bidding process and, thus, the wrongful conduct identified above caused harm to Cloud49.

**D.    Rackspace Hired Plaintiff's Former Employees And Induced Them To Breach Their Non-Disclosure Agreements.**

46.    In order to protect its intellectual property, Plaintiff entered into Non-disclosure Agreements with its employees.  Those Non-disclosure agreements were and are contracts that survived the termination of the employment relationship between Plaintiff and its former employees.  Those non-disclosure agreements define "Proprietary Information" as "information relating to various service projects and intellectual property" disclosed to the "Receiving Party" (defined as the employee).  Thus, the phrase "Proprietary Information" in the Non-disclosure Agreements was defined broadly and would include information received during employment in

addition to information recognized as a trade secret under Texas or federal law.  Each employee

agreed to the following in their respective Non-disclosure Agreement:

> In consideration of the disclosure of Proprietary Information by the Disclosing Party, the Receiving Party hereby agrees: (i) to hold the Proprietary Information in strict confidence and to take all reasonable precautions to protect such Proprietary Information (including, without limitation, all precautions the Receiving Party employs with respect to its own confidential materials), (ii) not to disclose any such Proprietary Information or any information derived therefrom to any third person, (iii) not to make any use whatsoever at any time of such Proprietary Information except to evaluate internally its relationship with the Disclosing Party, and (iv) not to copy or reverse engineer any such Proprietary Information.

47.     The employees of Cloud49, including those hired by Rackspace as discussed

below, had access to a plethora of "Proprietary Information," including software developed by

Cloud49, choses regarding software for implementations, templates and other protocols useful

for accelerating and managing cloud "instances" based on customer preferences, methods for

tracking and billing for use of cloud services, and other practices and procedures.  As discussed

in more detail below, some of the "Proprietary Information" possessed by the employees met the

statutory definition of a "trade secret" while other "Proprietary Information" protected by the

Non-disclosure Agreements would not rise to the level of a trade secret.

48.     Rackspace had never served as a public cloud manager on a contract of similar

size and responsibility as the Public Cloud Manager Contract with DIR.  Rackspace knew it

could not perform its obligations under the Public Cloud Manager Contract without the

knowhow in Cloud49's Proprietary Information, including trade secrets.   Accordingly,

Rackspace always intended to hire some of Plaintiff's employees and even made inquiries about

hiring Plaintiff's employees prior to officially being awarded the Public Cloud Manager

Contract.  Capgemini and Symbio knew that Rackspace needed to obtain Plaintiff's "Proprietary

Information," including trade secret information, and agreed with Rackspace's plan to take that information from Plaintiff's employees.

49.    Rackspace considered obtaining access to Plaintiff's trade secret information through lawful means.    In particular, Rackspace considered acquiring Plaintiff and made overtures about a possible acquisition.    However, Rackspace ultimately decided it would be cheaper to steal Plaintiff's "Proprietary Information," including trade secret information.

50.    After being awarded the Public Cloud Manager Contract, Rackspace employed David DuChene, John White, Philip Walenta, and other individuals who had worked for Plaintiff and who had signed non-disclosure agreements.    Despite Rackspace's awareness of those non-disclosure agreements, Rackspace intentionally induced those individuals to breach the contracts. In particular, Rackspace induced the former employees (i) to NOT hold the Proprietary Information in strict confidence and to NOT take all reasonable precautions to protect such Proprietary Information, (ii) to disclose to Rackspace Proprietary Information and information derived therefrom, (iii) to make any use of the Proprietary Information at Rackspace in violation of those former employees non-disclosure contracts.    As a result of those breaches, Rackspace obtained access to Cloud49's Proprietary Information, including software developed by Cloud49, knowledge of which software to use for implementations, templates and other protocols useful for accelerating and managing cloud "instances" based on customer preferences, methods for tracking and billing for use of cloud services, and other practices and procedures.    Through that improper sharing of Proprietary Information, some of which constitutes trade secrets, Rackspace was able to meet its initial obligations under the Public Cloud Manager Contract.    Once Rackspace had the Proprietary Information, including trade secrets, that it needed, Rackspace promptly fired almost all the former employees of Plaintiff.

51.    Cloud49 cooperated with Rackspace during the transition and provided Rackspace with non-proprietary information.  DIR did not require or direct Rackspace to induce Cloud49's employees to breach their obligation to protect Cloud49's Proprietary Information in the non-disclosure agreements or otherwise misappropriate trade secrets from Cloud49.

**E.**    **The Damage Done**

52.    The scoring process by DIR produced a weighted score differential in favor of Rackspace of only 0.25 points.  Without the wrongful conduct identified above, the scoring process would have favored Cloud49.  For instance, had Defendants not manipulated the process to exclude the Microsoft portion of the contract, Cloud49's bid price would have been lower than Rackspace's bid.  Had Cloud49 been provided the same information as Rackspace, Cloud49's bid price would have been lower than Rackspace's bid.  That change alone would have been sufficient to cause Cloud49 to have the best score.  Similarly, had Defendants not made false statements to DIR about Cloud49, then Cloud49's experience score would not have declined and Cloud49 would have won the contract.

53.    Prior to the wrongful conduct identified above, Plaintiff had been a successful company in the cloud management industry.  Plaintiff had invested significant funds in developing software and personnel capable on managing large cloud management projects, and Plaintiff's market value exceeded the initial investment by several multiples.  If Defendants had not acted wrongfully to deprive Plaintiff of the Public Cloud Manager Contract, Plaintiff would have been awarded the contract.  Over the term of the contract, Plaintiff would have generated tens of millions of dollars in profit, and all such profits were lost as a result of Defendants' conspiracy and wrongful acts.  Additionally, Plaintiff could have realized a return on its investment if Defendants had not conspired to steal Plaintiff's confidential and trade secret information.

## V.  CAUSES OF ACTION

**A.      Count One:  Fraud (Against Symbio)**

54.      Plaintiff realleges the paragraphs set forth above as if set forth herein.

55.      Symbio made a materially false representation to Plaintiff during the bidding process.  In particular, on a due diligence call on or about March 19, 2020, Jerry Price, acting within the scope of his employment with Symbio, stated to Donnie Gerault and other employees of Plaintiff on the call, that Plaintiff should bid based on the assumption that various Microsoft charges would not be included in the final contract.

56.      When Mr. Price (and thus Symbio) made that misrepresentation, Mr. Price (and thus Symbio) knew the statement was false or made the misrepresentation recklessly without knowledge of the truth.  In particular, Mr. Price knew that the Microsoft charges would be included in the final contract and told Rackspace such charges would be included in the final contract, and such charges were included in the final contract with Rackspace.

57.      Mr. Price (and thus Symbio) made the misrepresentation with the intent that Plaintiff act on it.  Immediately prior to Mr. Price making the misrepresentation, Plaintiff had asked if Plaintiff would still be responsible for supporting Microsoft related matters despite the removal of the Microsoft charges from the contract.  Mr. Price indicated that Plaintiff would be responsible for such support.  Plaintiff then relayed that, if the Microsoft charges were going to be included in the contract, Plaintiff would not need to charge DIR for support services and could bid without including a charge for support services; however, if the Microsoft charges were not going to be included in the contract, Plaintiff would need to charge DIR for support services and would have to include such amounts in its bid.  Mr. Price's false representation that the Microsoft charges were not going to be included in the contract was thus made to induce Plaintiff to include charges for support services in its bid.

58.     Plaintiff did rely on Symbio's misrepresentation to its detriment.  In particular, Plaintiff included charges for Microsoft support services in its bid totaling $9,229,032.  Had Plaintiff not included such charges in its bid, Plaintiff would have been the lowest bidder and would have won the Public Cloud Manager Contract under DIR's scoring system.

59.     As a result of the misrepresentations, Plaintiff has suffered injuries for which it seeks an award of actual damages, including lost profits from the loss of the Public Cloud Manager Contract.

60.     Additionally, Plaintiff seeks an award of exemplary damages for fraud.

**B.    Count Two:  Tortious Interference With Prospective Relations (Against Symbio)**

61.     Plaintiff realleges the paragraphs set forth above as if set forth herein.

62.     There was a reasonable probability that Plaintiff would have entered into a business relationship with DIR.  Plaintiff was the incumbent provider of the public cloud management services and only other bidder for the Public Cloud Manager Contract besides Rackspace.  Symbio was aware of the potential business relationship.

63.     As described above, Symbio intentionally interfered with the relationship. Symbio had a conscious desire to steer the Public Cloud Manager Contract to Rackspace and away from Cloud49 because Symbio did not want to risk its lucrative relationship with DIR by betting on a small company.  Symbio's acts, as set forth in this complaint, were not a mere incidental result of conduct Symbio was engaged in for another purpose but instead reflect a deliberate choice to depart from neutrality and stack the deck against Plaintiff.

64.     Symbio's conduct was independently tortious or unlawful.  Symbio committed fraud as set forth in Count One.  Additionally, Jerry Price (and thus Symbio) made false statements to Sally Ward of DIR to induce DIR to exclude the Microsoft charges from RFO2 for the purpose of harming Cloud49.  Symbio committed fraud by non-disclosure by failing to

contact and report on Cloud49's references to DIR as was its duty for the purpose of reducing Cloud49's chance of being awarded the contract.

65.     Symbio's interference with Plaintiff's relationship proximately caused Plaintiff's injuries, and Plaintiff suffered actual damages and losses, including lost profits.

**C.**     <u>**Count Three:  Fraud (Against Capgemini)**</u>

66.     Plaintiff realleges the paragraphs set forth above as if set forth herein.

67.     Capgemini made numerous materially false representations to Plaintiff during the bidding process.   In particular, Lawrence Boatwright of Capgemini made requests for information to employees of Cloud49 including Donnie Gerault and Zach Gates based on the stated and false pretense of collecting information for DIR but in actuality for the purpose of feeding information to Rackspace to improve Rackspace's bids.

68.     When Mr. Boatwright and Capgemini made the misrepresentations, Capgemini knew the representations were false or made the representations recklessly without knowledge of the truth.

69.     Capgemini made the representations with the intent that Plaintiff act on it, and Plaintiff did rely on the misrepresentations to its detriment.   In particular, Capgemini falsely represented the purpose of its inquiries so that Plaintiff would comply when Capgemini knew that Plaintiff would protest and resist if it knew the true purpose was to aid a competitor.   Based on the mistaken belief that Capgemini was acting in good faith on behalf of DIR, Plaintiff complied with Capgemini's requests and Capgemini fed such information to Rackspace.   The provision of such information allowed Rackspace to revise its bid to more closely reflect Cloud49's staffing and resourcing model.

70.     As a result of the misrepresentations, Plaintiff has suffered injuries for which it seeks an award of actual damages, including lost profits.   In particular, Rackspace was able to

boost its experience and past performance score through the information obtained by Capgemini under false pretenses, which caused the Public Cloud Manager Contract to be awarded to Rackspace instead of Cloud49.

71.     Additionally, Plaintiff seeks an award of exemplary damages for fraud.

**D.    Count Four:     Tortious Interference With Prospective Relations (Against Capgemini)**

72.     Plaintiff realleges the paragraphs set forth above as if set forth herein.

73.     There was a reasonable probability that Plaintiff would have entered into a business relationship with DIR.  Plaintiff was the incumbent provider of the public cloud management services and only other bidder for the Public Cloud Manager Contract besides Rackspace.  Capgemini was aware of the potential business relationship.

74.     As described above, Capgemini intentionally interfered with the relationship. Capgemini knew that it could increase its fees by shifting the contract from Cloud49 to Rackspace and consciously set out to steer the contract away from Cloud49.  Capgemini's acts as set forth in this complaint were not a mere incidental result of conduct Capgemini was engaged in for another purpose but instead reflect a deliberate choice to depart from neutrality and stack the deck against Plaintiff.

75.     Capgemini's conduct was independently tortious or unlawful.   Capgemini committed fraud as set out in Count Three.  Additionally, Ken Sinclair (and thus Capgemini) made false statements to Sally Ward of DIR to induce DIR to exclude the Microsoft charges from RFO2 for the purpose of harming Cloud49.  Moreover, Ken Sinclair made false statements to Sally Ward of DIR regarding the reason why CapGemini's tracking was inaccurate and falsely attributed the error to Cloud49 for the purpose of causing DIR to choose Rackspace over Cloud49.  Capgemini committed fraud by non-disclosure by failing to contact and report on

Cloud49's references to DIR, as was its duty, for the purpose of reducing Cloud49's chance of being awarded the contract. Additionally, Capgemini committed the independently tortious and unlawful act of providing Rackspace with information from Cloud49's bids and information obtained from Cloud49 through the false pretenses identified above and providing Rackspace with correct information regarding whether the Microsoft charges would ultimately be included in the contract while Cloud49 was provided with false information.

76.     Capgemini's interference with Plaintiff's relationship proximately caused Plaintiff's injuries, and Plaintiff suffered actual damages and losses, including lost profits.

**E.     Count Five:  Violation Of the Defend Of Trade Secrets Act (Against Rackspace)**

77.     Plaintiff realleges the paragraphs set forth above as if set forth herein.

78.     The Defend Trade Secrets Act enacted by Congress and as codified in 18 U.S.C. § 1836 provides for a private cause of action by an owner of a trade secret that has been misappropriated.

79.     Plaintiff was and is the owner of trade secrets, including software developed by Cloud49, knowledge of which software to use for implementations, templates and other protocols useful for accelerating and managing cloud "instances" based on customer preferences, methods for tracking and billing for use of cloud services, and other practices and procedures, knowledge of customer preferences, and processes and procedures for public cloud management, which Plaintiff took reasonable steps to keep secret and which derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. In particular, Plaintiff took steps to keep the information secret through confidentiality agreements and other restrictions on the information. The information derived economic value from not being known to competitors such as Rackspace, which had no

experience of any kind with public contracts or public cloud management for public entities and needed the information in order to perform the contract it had just been awarded.  The information was not readily ascertainable through proper means because no one else was engaged in a similar activity, the information resided solely within Cloud49, and Cloud49 had no obligation to disclose the information to other persons.  Had Rackspace not misappropriated the information, Rackspace would have had to pay Cloud49 for the information.

80.    Public cloud infrastructure resides on servers scattered across the United States. Public cloud management such as what Cloud49 previously performed for DIR and as Rackspace is performing for DIR now involves both products and services in interstate commerce because the physical infrastructure being managed is located in multiple states.  The trade secrets identified in the preceding paragraph are thus related to products and services used in interstate commerce.

81.    Rackspace misappropriated all or perhaps only some of the foregoing trade secrets.  In particular, Rackspace acquired Plaintiff's trade secrets through Plaintiff's former employees, which Rackspace hired to obtain such confidential information.  After having used improper means to acquire Plaintiff's trade secrets, Rackspace then used Plaintiff's trade secrets when performing the contract for DIR.

82.    To remedy the misappropriation, Plaintiff seeks an award of actual loss caused by the misappropriation and damages for unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss.  Alternatively, Plaintiff seeks an award of the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the Rackspace's unauthorized disclosure or use of one or more trade secrets.

**F.      Count Six:  Tortious Interference With Existing Contracts (Against Rackspace).**

83.      Plaintiff realleges the paragraphs set forth above as if set forth herein.

84.      Plaintiff had valid nondisclosure contracts with its employees.    Those nondisclosure contracts required each employee (i) to hold the Proprietary Information in strict confidence and to take all reasonable precautions to protect such Proprietary Information (including, without limitation, all precautions the Receiving Party employs with respect to its own confidential materials), (ii) not to disclose any such Proprietary Information or any information derived therefrom to any third person, (iii) not to make any use whatsoever at any time of such Proprietary Information except to evaluate internally its relationship with the Disclosing Party, and (iv) not to copy or reverse engineer any such Proprietary Information.

85.      Rackspace willfully and intentionally interfered with those contracts by inducing Plaintiff's former employees to breach those obligations in the non-disclosure contracts.    In particular, induced the former employees (i) to NOT hold the Proprietary Information in strict confidence and to NOT take all reasonable precautions to protect such Proprietary Information, (ii) to disclose to Rackspace Cloud49's Proprietary Information and information derived therefrom, (iii) to make any use of the Proprietary Information at Rackspace in violation of those former employees non-disclosure contracts.

86.      Rackspace was not directed to breach Plaintiff's non-disclosure contracts by DIR and had no right to take Cloud49's Proprietary Information.  Rackspace chose to induce the breach of the non-disclosure contracts because it desperately needed the Proprietary Information, including software developed by Cloud49, knowledge of which software to use for implementations, templates and other protocols useful for accelerating and managing cloud "instances" based on customer preferences, methods for tracking and billing for use of cloud services, and other practices and procedures.

87.    In order to alleviate any concerns regarding preemption by the Texas Uniform Trade Secrets Act, Plaintiff is only asserting this tortious interference claim in the alternative to cover any "Proprietary Information" protected by the non-disclosure agreements and improperly disclosed if such "Proprietary Information" is found by the fact-finder to not constitute a trade secret under federal or state law.

88.    Rackspace's interference injured Plaintiff by allowing Rackspace to obtain Plaintiff's confidential information without an acquisition of Plaintiff.  As a result, the value of the Proprietary Information was lost to Plaintiff.

89.    Plaintiff incurred actual damages and losses as a result of the interference, namely the loss of all of its investment and the value of a potential acquisition.

**G.    Count Seven:    Tortious Interference With Prospective Relations (Against Rackspace).**

90.    Plaintiff realleges the paragraphs set forth above as if set forth herein.

91.    There was a reasonable probability that Plaintiff would have entered into a business relationship with DIR.  Plaintiff was the incumbent provider of the public cloud management services and only other bidder for the Public Cloud Manager Contract besides Rackspace.  Rackspace was also fully aware of the potential business relationship between Plaintiff and DIR.

92.    Rackspace intentionally interfered with the potential relationship.  Rackspace knew that it had no experience or ability to perform the Public Cloud Manager Contract and needed to cheat to defeat the incumbent Cloud49.  In a binary bidding process, Rackspace would benefit from harming Cloud49's bid and, given its poor performance in the first two rounds of bidding, reducing Cloud49's score was essential to Rackspace's victory.

93.     Specifically, Rackspace misrepresented their past experience with respect to managing public cloud contracts in an effort to intentionally interfere with Plaintiff's prospective relations with DIR as well as to intentionally deprive Plaintiff of valuable future business opportunities.  Rackspace's awareness of its inability to perform the Public Manager Contract is shown by Rackspace's immediate attempts to hire Cloud49 employees, even before the Contract was awarded, in an effort to use Plaintiff's experience to achieve goals that Rackspace could not meet on its own.

94.     Rackspace's conduct was independently tortious or unlawful.  Rackspace made knowing and intentional misrepresentations to DIR regarding its own capabilities and secretly planned to cure the deficiencies in its own experience after being awarded the Public Cloud Manager Contract by misappropriating Plaintiff's confidential information and trade secrets. Additionally, Rackspace knew that a competitor's bid was intended to be kept confidential under the state's bidding procedures; however, Rackspace solicited Capgemini to share information from Cloud49's bids and information regarding Cloud49's approach to staffing and resourcing and, upon the receipt of such information, Rackspace modified its bid.

95.     Defendants' interference with Plaintiff's relationship proximately caused Plaintiff's injuries, and Plaintiff suffered actual damages and losses, including lost profits.

**H.    <u>Count Eight:  Conspiracy (Against All Defendants)</u>**

96.     Plaintiff realleges the paragraphs set forth above as if set forth herein.

97.     Rackspace, Capgemini, and Symbio were each members of a combination. Plaintiff suspects that the combination formed prior to the conclusion of the first round of bidding; however, the combination was affirmed when representatives of the three Defendants acting within their scope of employment met together on or about February 5, 2020 ostensibly to review Rackspace's bid.  At that point, Rackspace had decisively lost and should have been

eliminated from the bidding process. Rackspace's pricing was $80,698,261 more than Plaintiff's pricing, and Plaintiff had a score of 100 while Rackspace had a score of only 81.95. For the other contracts being bid at the same time, bidders were eliminated if they deviated more than 10% from the lead bidder. Rackspace should have been eliminated but instead the three Defendants reached agreement at that meeting that Rackspace would win the contract instead of being eliminated. Thereafter, each of the Defendants engaged in unlawful overt acts in furtherance of the conspiracy. Defendants reconfirmed the conspiracy on multiple occasions including in a meeting involving all three parties on March 10, 2020 and in a meeting between Rackspace and Capgemini at a tech conference.

98.     The object of the combination was to accomplish a lawful purpose by unlawful means. In particular, the object of the combination was to cause Rackspace to be awarded the Public Cloud Manager Contract – a lawful purpose – through unlawful means such as the fraud and tortious interference identified above and to hide and overcome Rackspace's inability to perform the Public Cloud Manager Contract – an unethical though lawful purpose – through the tortious interference and trade secret misappropriation identified above. Each of the Defendants benefited from the combination and needed each of the other Defendants to commit an unlawful act in order for the object of the combination to succeed.

99.     Rackspace, Capgemini, and Symbio had a meeting of the minds on the object and course of action of the combination. Through meetings of representatives of all three Defendants (including on February 5, 2020 and March 10, 2020), the parties reached agreement that Rackspace would win the contract and the parties would do what was necessary to secure that victory, including the torts identified in this complaint.

100.    Capgemini, Symbio, and Rackspace committed the unlawful overt acts identified in the foregoing causes of action to further the object and course of action of the combination.  In particular, Symbio committed the fraud and tortious interference identified in Counts One and Two to further the object and course of action of the combination; Capgemini committed the fraud and tortious interference identified in Counts Three and Four to further the object and course of action of the combination; and Rackspace committed the violations of the Defend Trade Secrets Act, tortious interference with existing contracts, and tortious interference with prospective contracts in Counts Five, Six, and Seven to further the object and course of action of the combination.

101.    Plaintiff suffered injury as a proximate result of the unlawful overt acts for which it seeks an award of damages, including lost profits.

## VII. <u>DEMAND FOR A JURY TRIAL</u>

102.    Plaintiff hereby demands a trial by jury.

## VIII.  <u>PRAYER FOR RELIEF</u>

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that the Court enter a judgment against Defendants awarding Plaintiff its actual, special, consequential, and exemplary damages, as well as attorneys' fees, and costs and expenses.  Plaintiff prays for such further relief, whether in equity or at law, to which Plaintiff may be justly entitled.

Respectfully submitted,

/s/ Jack G. B. Ternan
**William H. Chamblee**
State Bar No. 04086100
wchamblee@cr.law
**Jack G. B. Ternan**
State Bar No. 24060707
jternan@cr.law
**Seth R. Wilson**
State Bar No. 24108882
swilson@cr.law

**CHAMBLEE RYAN, P.C.**
2777 N. Stemmons Freeway, Suite 1257
Dallas, Texas 75207
(214) 905-2003
(214) 905-1213 (Facsimile)
**ATTORNEYS FOR PLAINTIFF**

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that a true and correct copy of this filing was delivered via ECF to all parties of record on November 1, 2022.

Deborah C. Trejo
Kemp Smith LLP
2905 San Gabriel Street, Suite 205
Austin, Texas 78705
**Counsel for Defendant CapGemini America, Inc.**

Daniel Durell
Locke Lord LLP
600 Congress Ave., Suite 2200
Austin, Texas 78701
**Counsel for Defendant Rackspace Technology, Inc**

Ashley Presson
Gordon Rees Scully Mansukhani, LLP
2705 Bee Caves Road, Suite 220
Austin, Texas 78746
**Counsel for Defendant Symbio Ecosystems, LLC**

/s/ Jack G. B. Ternan
Jack G. B. Ternan