IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CLOUD49, LLC, | § | No. 1:22-CV-229-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| RACKSPACE TECHNOLOGY, INC., | § | |
| and CAPGEMINI AMERICA, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

ORDER: (1) GRANTING CAPGEMINI'S MOTION FOR SUMMARY
JUDGMENT; AND (2) GRANTING RACKSPACE'S
<u>MOTION FOR SUMMARY JUDGMENT</u>

Before the Court is Defendant Capgemini America, Inc.'s

("Capgemini") Motion for Summary Judgment (Dkt. # 75), and Defendant

Rackspace Technology, Inc.'s ("Rackspace") Motion for Summary Judgment (Dkt.

# 77). On April 10, 2024, the Court held a hearing on these motions. Upon careful

consideration of the arguments and evidence raised by the parties both at the

hearing and in the record of the case, the Court—for reasons that follow—

**GRANTS** both motions.

BACKGROUND

Plaintiff Cloud49, LLC ("Cloud49") was a cloud computing company based out of Austin, Texas.[1]  (Dkt. #38 at ¶10.)  Cloud49 had been in business for almost a decade at the time of the events at issue.  (Id.)  Beginning in 2015, Cloud49 provided its cloud management services to the Texas Department of Information Resources ("DIR"), a state agency providing information technology services to other state agencies.  (Id. at ¶¶11-12.)  Cloud49 worked on behalf of DIR for a five-year period.  (Id. at ¶14.)

In 2019, DIR reorganized its methods for contracting data center services, issuing requests for offers ("RFO") on seven of its data center services, including "Texas Private Cloud," "Managed DCS Network," "DCS Security Operations Services," "Technology Solutions Services," "Public Cloud Manager," "Print, Mail, and Digitalization," and "Mainframe Services."  (Id.)  Companies submitting offers for certain services were barred from submitting offers for others.  (Id.)  Defendant Capgemini was contracted by DIR to serve as the "Multi-sourcing Services Integrator" ("MSI") to ensure the services rendered by the various providers would function together in a usable form for DIR's state agency customer base.  (Id. at ¶15.)  Symbio Ecosystems ("Symbio") was contracted by

---

[1] Cloud49 is no longer in business.

DIR to help oversee and conduct the bidding process on the Public Cloud Manager Contract (the "Contract"). (Id.)

DIR issued its First RFO on the Contract on October 25, 2019, and held a solicitation conference on November 13, 2019, which was attended by thirty-six separate vendors. (Id. at ¶16.) Both Cloud49 and Defendant Rackspace bid for the Contract. (Id.) DIR graded each vendor based on four criteria: technical solution and service delivery, experience and past performance, transition, and pricing. (Id. at ¶17.) Cloud49 alleges that Capgemini, Symbio, and Rackspace conspired for Rackspace to be awarded the contract by advising DIR to conduct additional rounds of bidding, even though Cloud49 significantly outscored Rackspace in the first two rounds of bidding. (Id. at ¶¶17-20.) Rackspace narrowly outscored Cloud49 in the third round and won the Contract. (Id. at ¶21.)

Cloud49 alleges that it lost the Contract because of Defendants' agreement to manipulate the bidding process in Rackspace's favor and subsequent acts meant to deny Cloud49 a fair bidding process. (Id. at ¶24.) Specifically, Cloud49 alleges that Defendants' misconduct resulted in Cloud49's pricing to exceed Rackspace's pricing (id. at ¶¶28-33) and Rackspace's experience and past performance score to exceed Cloud49's experience score. (Id. at ¶¶34-45.)

Regarding the pricing, Cloud49 alleges that between the first and second bids, Capgemini and Symbio persuaded DIR to exclude the charges for

Microsoft software and services from the second bid, believing that changing the terms of the bid would provide Rackspace a means to beat Cloud49 that would be otherwise impossible.  (Id. at ¶¶29-30.)  Cloud49 further alleges that during a due diligence call, Symbio intentionally misrepresented the terms of the contract related to these services, inducing Cloud49 to submit a higher bid in reliance upon the representations, while Rackspace was given accurate representations of the contract terms and was therefore able to submit a lower bid.  (Id. at ¶¶31-33.)

Regarding the score, Cloud49 alleges that Rackspace's score for experience and past performance increased in the final round of bidding as the result of Defendants' misconduct, and, but for this misconduct, Cloud49's score would not have gone down, and it would have been awarded the contract.  (Id. at ¶34.)  Cloud49 alleges that Capgemini used its position as the MSI to misrepresent the information maintained by Cloud49 regarding current and future data usage for the purpose "of discrediting Cloud49 and steering the contract towards Rackspace."  (Id. at ¶¶35-36.)  Cloud49 alleges that as a result of these misrepresentations, DIR reduced its scores in the final round.[2]  (Id. at ¶37.)  Cloud49 further alleges that Capgemini and Symbio failed to contact Cloud49's references during the procurement process and thus "committed fraud by non-

---

[2] Cloud49 does not allege that DIR failed to follow its internal processes in scoring the bids; instead, as discussed, Cloud49 contends that the scoring was improperly affected by Rackspace and Capgemini.  (Dkt. # 79 at 5.)

disclosure by failing to include information regarding Cloud49's references" in their reports to DIR.  (Id. at ¶38.)

Additionally, Cloud49 alleges that Rackspace hired former employees of Cloud49 and induced them to breach their nondisclosure agreements ("NDAs"). (Id. at ¶¶46-51.)  Cloud49 further alleges that as a result of these breaches, Rackspace obtained access to Cloud49's Proprietary Information "including software developed by Cloud49, knowledge of which software to use for implementations, templates and other protocols useful for accelerating and managing cloud 'instances' based on customer preferences, methods for tracking and billing for use of cloud services, and other practices and procedures."  (Id. at ¶50.)  Cloud49 alleges that as a result of Rackspace's improper acquisition of this information, Rackspace was able to meet its initial obligations under the Contract, and once this information had been obtained, Rackspace fired almost all of the former employees of Cloud49.  (Id.)

Cloud49 filed suit against Rackspace, Capgemini, and Symbio.[3]  (See Dkt. # 38.)  Cloud49's third amended complaint brought claims against Rackspace for violation of the Defense of Trade Secrets Act, tortious interference with existing contracts, tortious interference with prospective relations, and conspiracy.

---

[3] On May 1, 2023, Cloud49 dismissed all claims against Symbio with prejudice. (Dkt. #64.)

Against Capgemini, Cloud49 alleged claims for fraud, tortious interference with prospective relations, and conspiracy. (Id.)

On October 27, 2023, Capgemini filed a motion for summary judgment. (Dkt. # 75.) On November 1, 2023, Cloud49 filed a response in opposition. (Dkt. # 79.) On December 7, 2023, Capgemini filed its reply. (Dkt. # 83.) On October 30, 2023, Rackspace filed a motion for summary judgment. (Dkt. # 77.) On November 20, 2023, Cloud49 filed a response in opposition.[4] (Dkt. # 82.) On December 11, 2023, Rackspace filed its reply. (Dkt. # 85.)

## APPLICABLE LAW

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Vann v. City of Southaven, 884 F.3d 307, 309 (5th Cir. 2018) (citations omitted); see also Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Bennett v. Hartford Ins. Co. of Midwest, 890 F.3d 597, 604 (5th Cir. 2018) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes

---

[4] Cloud49 also appears to have filed a duplicate response in error on the same day. (Dkt. # 81.) Since the filings appear to be the same, the Court will consider only the last filed response. (Dkt. # 82.)

6

demonstrate the absence of a genuine issue of material fact.'" Nola Spice Designs, LLC v. Haydel Enter., Inc., 783 F.3d 527, 536 (5th Cir. 2015) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating . . . that there is an issue of material fact warranting trial.'" Kim v. Hospira, Inc., 709 F. App'x 287, 288 (5th Cir. 2018) (quoting Nola Spice Designs, 783 F.3d at 536). While the movant must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. Austin v. Kroger Tex., L.P., 864 F.3d 326, 335 (5th Cir. 2017) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)). A fact is material if it "might affect the outcome of the suit." Thomas v. Tregre, 913 F.3d 458, 462 (5th Cir. 2019) (citing Anderson, 477 U.S. at 248).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." Jones v. Anderson, 721 F. App'x 333, 335 (5th Cir. 2018) (quoting Duffie v. United States, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. Infante v. Law Office of Joseph Onwuteaka, P.C., 735 F. App'x 839, 843 (5th Cir. 2018) (quoting Willis v. Cleco

Corp., 749 F.3d 314, 317 (5th Cir. 2014)).  "This burden will not be satisfied by

'some metaphysical doubt as to the material facts, by conclusory allegations, by

unsubstantiated assertions, or by only a scintilla of evidence.'"  McCarty v.

Hillstone Rest. Grp., Inc., 864 F.3d 354, 357 (5th Cir. 2017) (quoting Boudreaux v.

Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005)).  In deciding a summary

judgment motion, the court draws all reasonable inferences in the light most

favorable to the nonmoving party.  Wease v. Ocwen Loan Servicing, LLC,

915 F.3d 987, 992 (5th Cir. 2019).

Additionally, at the summary judgment stage, evidence need not be

authenticated or otherwise presented in an admissible form.  See Fed. R. Civ. P.

56(c); Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir.

2017).  However, "[u]nsubstantiated assertions, improbable inferences, and

unsupported speculation are not sufficient to defeat a motion for summary

judgment."  United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012)

(quoting Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003)).

DISCUSSION

The Court will address each of the summary judgment motions in

turn.

I.    <u>Capgemini's Motion for Summary Judgment</u>

Capgemini moves for summary judgment on all of Cloud49's claims. (Dkt. # 75.)  Capgemini argues that Cloud49's claims rest on the implicit assumption that DIR's statements are false, but there is no evidence to support any of the claims.  (<u>Id.</u> at 6.)  Capgemini maintains that Cloud49's claims are based only on speculation and surmise and that the only reason it was not awarded the Contract was because it did not provide the best value for the State of Texas.  (<u>Id.</u> at 6–7.)  In responding to Capgemini's motion, Cloud49 admits that it cannot prove the required elements to maintain its claims for fraud and conspiracy.  (Dkt. # 79 at 1–2.)  Accordingly, the Court will grant summary judgment on those two claims in favor of Capgemini.  Regarding the tortious interference with prospective business relations claim, Cloud49 argues that it has sufficient evidence to proceed to trial. (<u>Id.</u>)

A.    <u>Tortious Interference with Prospective Relations</u>

To establish a claim for tortious interference with prospective relations, a plaintiff must demonstrate: (1) a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or

unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.  Coinmach Corp. v. Aspenwood Apartment Corp., 417 S.W.3d 909, 923 (Tex. 2013).

To establish a claim for tortious interference, a plaintiff must prove that more than mere negotiations occurred.  See Milam v. Nat'l Ins. Crime Bureau, 989 S.W.2d 126, 132 (Tex. App.—San Antonio 1999, no pet.); Caller–Times Publ'g Co. v. Triad Commc'ns, Inc., 855 S.W.2d 18, 24 (Tex. App.—Corpus Christi 1993, no writ).  Though it is not necessary to prove that the contract would have certainly been made but for the interference, that result must have been reasonably probable, considering all of the facts and circumstances attendant to the transaction.  Richardson-Eagle, Inc. v. William M. Mercer, Inc., 213 S.W.3d 469, 475–76 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

1.   Reasonable Probability of Prospective Business Relationship

Capgemini asserts there is no evidence it had any role in advising DIR in the bidding process, nor interfering with the process in any way. (Dkt. # 75 at 9.)  And, according to Capgemini, even if it had, it is still entitled to summary judgment because Cloud49 never made it past the bidding process in which DIR dictated the terms of each request offer and revised request offer.  (Id.) Capgemini maintains that only DIR could make the decision on whom to award the Contract and that DIR rejected Cloud49's bid for substantive reasons, including

because Rackspace offered the better value to the State. (Id.) For this reason, Capgemini contends that there was no reasonable probability Cloud49 would have been awarded the Contract.

In response, Cloud49 contends that it was the initial provider of public cloud services for DIR and it was already doing the cloud management work for DIR under the existing contract. (Dkt. # 79 at 11.) Additionally, Cloud49 argues that it is undisputed that it had already won the first two rounds of bidding for the Contract at issue, and that it lost in the third round by a very thin margin–0.25 points, but still won two of the four categories. (Id.) Therefore, Cloud49 maintains that a jury could conclude that there is a reasonable probability that it, as the current service provider and one of only two bidders, would have won the contract. (Id. at 11–12.)

In support of its arguments, Cloud49 provides the following evidence: (1) because it was the current service provider for DIR, it noted after the first revised RFO, that information in the request was incorrect and did not reflect the likely unit levels that the winner of the Contract would have to address (Dkt. # 79-1 at 6); (2) after submitting responses to the revised RFO with a note about DIR's incorrect information, on March 11, 2020, representatives of Cloud49 met with representatives of DIR and Capgemini to discuss Cloud49's response to the revised RFO (id.); (3) at a later procurement meeting where Cloud49 was not present, DIR

asked Capgemini why Cloud49's numbers were erroneous and Ken Sinclair, the

account executive for Capgemini, stated that the erroneous numbers were the fault

of Cloud49 because it could not tag or track the data correctly, but Cloud49 alleges

these statements were false and that Cloud49 did not supply the faulty numbers,

but Capgemini did (id.); and (4) not long after that meeting, two DIR employees

who were in attendance at the meeting reduced their scores for Cloud49 in the

"Experience and Past Performance" category, causing Rackspace to win the

Contract by 0.25 points (id.).

Notably, Capgemini disputes Cloud49's evidence especially

concerning Sinclair's statements at the meeting.  (Dkt. # 83 at 3.)  According to

Capgemini, Sinclair does not remember making any such statement blaming

Cloud49 for the tagging issue.  (Id.)  Instead, Capgemini contends that to the extent

Sinclair made the statement, it was made by mistake and not to interfere with the

bidding process.  (Id. at 4.)  Capgemini further disputes Cloud49's evidence that

there was a reasonable probability of contract formation by providing its own

evidence that Cloud49 would not have been awarded the Contract, including:

(1) the Chief Procurement Officer of DIR, Hershel Becker, stated that Cloud49

failed to provide the requisite references where it served as the prime vendor for

similar projects (Dkt. # 75-1 at 50); (2) a member of Cloud49's bid team

acknowledged that DIR was concerned that if Cloud49 was awarded the Contract

and anything adverse happened Cloud49 would file bankruptcy and "the State would be left holding the bag" (Dkt. # 77-1 at 60); and (3) DIR expressly disclaimed in the bid request that it was not obligated to enter into a contract with any of the bidders (id. at 166).

Despite Capgemini's evidence to the contrary, the Court finds that a jury could find that there is a reasonable probability of contract formation given Cloud49's evidence that Sinclair blamed Cloud49 for the tagging or tracking error to DIR shortly before the last round of bidding, along with evidence that Cloud49 had clearly won the first two rounds prior to the meeting. Although Capgemini disputes Cloud49's evidence,[5] the Court concludes that a fact issue exists as to whether Cloud49 would have won the Contract had Sinclair not made the statement. The Court will move on to the second and third elements—whether Capgemini intentionally interfered with the formation of the relationship, and whether the alleged conduct was independently tortious.

---

[5] Capgemini also argued at the hearing that DIR could have entered into negotiations with both Cloud49 and Rackspace despite the scoring, but that it chose not to given the evidence from DIR that Cloud49 was not performing under the current contract and did not have references to show they had been a prime contractor at the level needed in the past. Despite Capgemini's contention, the Court will still draw all inferences in favor of Cloud49 for this element of the claim.

2.    Intentional Interference and Independently Tortious

Capgemini contends that Cloud49 lacks evidence that Capgemini desired to interfere in the Contract bidding process, nor that any such conduct was independently tortious.  (Dkt. # 75 at 10.)  The Supreme Court of Texas has stated that interference is intentional "if the actor desires to bring about or if he knows that the interference is certain or substantially certain to occur as a result." Bradford v. Vento, 48 S.W.3d 749, 757 (Tex. 2001).  Additionally, the Supreme Court of Texas has made it clear that to establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful.  Wal–Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 726 (Tex. 2001). "'Independently tortious' means that the conduct objected to would violate 'some other recognized tort duty.'"  Star Tobacco Inc. v. Darilek, 298 F. Supp. 2d 436, 448 (E.D. Tex. 2003).  "Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations . . . ."  Sturges, 52 S.W.3d at 726.

In support of its assertion that Capgemini intended to interfere in the bidding process, Cloud49 again offers the same evidence that Sinclair made false statements about Cloud49 to DIR during a meeting.  (Dkt. # 79 at 14.)  Cloud49 contends that Sinclair, among other statements, told DIR that Cloud49 was

14

responsible for the failure to include accurate server numbers in the bidding documents.  (Dkt. # 79-1 at 6.)  However, it is now undisputed that it was not Cloud49 who was responsible for maintaining that information and, therefore, Cloud49 contends that Sinclair's statements were false.  (Id.)  Cloud49 also presents the testimony of other Cloud49 employees who state that Sinclair's statements were false.  (See id. at 6, 60, 61, 68–69, 70.)

Cloud49 also includes evidence that Sinclair denied making the statement to DIR in the meeting at all (Dkt. # 75-1 at 4), but Sinclair concedes that if he did make the statement, "the attribution was made in error" (id.). Additionally, Sinclair's deposition testimony was that he did not "recall making a statement about it at that session."  (Dkt. # 79-1 at 75.)  Given this disputed evidence, Cloud49 argues that a jury must decide whether Sinclair made the statement at all, and if he did, whether it was by mistake or with intent to harm Cloud49's business.  (Dkt. # 79 at 15.)

Cloud49 further contends that Sinclair's testimony that he did not remember making the statement to DIR is evidence that he in fact had a bad intent—Cloud49 argues that if Sinclair truly did make the statement by mistake, he would admit to making it.  (Dkt. # 79 at 15.)  Additionally, Cloud49 posits that Sinclair had an incentive to lie because Capgemini would obtain a financial benefit if Cloud49 lost the bid.  (Id.)  According to the declaration of Jerry Gerault, the

former Chief Executive Officer ("CEO") of Cloud49, Capgemini "was going to be paid to assist with the transition from [the former program manager] to the new provider under the PCM Contract," and that if Cloud49 (the current provider) was awarded the Contract, the amount of transition work and associated fees would be lower, thus incentivizing Capgemini to interfere in the bid process. (Dkt. # 79-1 at 6.) Cloud49 also includes evidence that, later in the day after the meeting, Capgemini sent an email to numerous DIR employees about Cloud49's alleged failures. (Id. at 6, 23.) And, according to Cloud49, its personnel viewed Capgemini's conduct at the time as hostile and intentional, escalating the matter to Capgemini's more senior personnel. (Id. at 6–7.)

Despite Cloud49's evidence in support of its assertion that Capgemini intentionally interfered in the bid process, the Court finds its evidence lacking as to whether Capgemini acted with a conscious desire to interfere or knew the interference was certain or substantially certain to occur. Although Cloud49 has presented its own CEO's statement that Capgemini would receive a higher pay amount if Rackspace were chosen for the Contract, Cloud49 fails to provide any specific evidence of such other than its own conclusory assertions. In fact, Gerault states only "[i]n *my opinion*, Capgemini's false statements about Cloud49 were likely intentional and not accidental." (Dkt. # 79-1 at 6 (emphasis added).) Regarding whether Sinclair could remember his statements to DIR at the

16

March 11, 2020 meeting, even if a fact issue exists as to whether he made the statement, Cloud49 has not provided sufficient evidence that if he indeed made it, it was made in an attempt to interfere with the bidding process as opposed to a mistaken belief.  And, as Capgemini contends, the March 11, 2020 email went out to three Cloud49 employees and two Atos (former servicer) employees, and eighteen people were copied—only four of which were DIR employees.  Cloud49 has not provided sufficient evidence beyond the email that it was sent as anything other than a collaboration between Cloud49 and Capgemini in an attempt to clear up the confusion regarding the alleged error in the tagging of servers.  It does not provide sufficient evidence which would create a fact issue as to whether the email was sent to intentionally interfere as opposed to being sent only by mistake.  Nor does the content of the email lead the Court to conclude such.  Cloud49 therefore has failed to provide sufficient evidence that Capgemini acted with a conscious desire to prevent the business relationship between Cloud49 and DIR from occurring.

And although Cloud49 argues that a plaintiff can recover from a defendant who makes fraudulent statements about the plaintiff to a third party without proving the third party was actually defrauded, Cloud49 has failed to present sufficient evidence that Capgemini made any fraudulent statement to DIR. (Dkt. # 79 at 14 (citing Sturges, 52 S.W.3d at 726).)  Cloud49 has admitted it

cannot prove its fraud claim in response to Capgemini's motion, and it presents no other evidence in support—only that Sinclair's statement was false, but no evidence that it was fraudulent.  Even if Sinclair's conduct could be considered "sharp" or unfair because it provided incorrect information in the bidding process, see Sturges, 52 S.W.3d at 726, the Court does not find a fact issue exists on whether it was tortious behavior on the evidence presented by Cloud49.  And, even if Sinclair knew that making an incorrect statement would harm the bidding process, the Supreme Court of Texas has determined that "[i]f the actor had no desire to effectuate the interference by his action but knew that it would be a mere incidental result of conduct he was engaging in for another purpose, the interference may be found to be not improper."  Bradford, 48 S.W.3d at 757. Accordingly, because Cloud49 has failed to present competent summary judgment evidence on the second and third elements of a claim for tortious interference with prospective business relations, the Court will grant summary judgment to Capgemini.

Based on the foregoing, the Court **GRANTS** Capgemini's Motion for Summary Judgment (Dkt. # 75), and **DISMISSES WITH PREJUDICE** Cloud49's claims against Capgemini.

II.    <u>Rackspace's Motion for Summary Judgment</u>

Rackspace moves for summary judgment on all of Cloud49's claims against it. (Dkt. # 77.) Rackspace argues that Cloud49 cannot meet its summary judgment burden on its claims for tortious interference with prospective business relations, trade secrets, tortious interference with existing contract, or for conspiracy. (<u>Id.</u>) In response, Cloud49 argues that it has sufficient evidence to proceed to trial on its claims for tortious interference with prospective business relations, trade secrets, and tortious interference with existing contract, but concedes that it cannot prove its conspiracy claim. (Dkt. # 82.) Accordingly, the Court will grant summary judgment on the conspiracy claim in favor of Rackspace. The Court will consider the remaining claims below.

A.    <u>Tortious Interference with Prospective Relations</u>

Cloud49 alleges that Rackspace intentionally interfered with Cloud49's prospect of entering into the Contract by: (1) misrepresenting in its bid to DIR that it had "proven expertise" with "government contract[s] for public cloud management," and (2) "solicit[ing] Capgemini to share information from Cloud49's bids." (Dkt. # 38 at 13.) Rackspace argues that there is no evidence that it competed unfairly for the Contract, much less that it engaged in independently tortious conduct which caused Cloud49 injury. (Dkt. # 77 at 10.)

Again, to establish a claim for tortious interference with prospective relations, a plaintiff must demonstrate: (1) a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. Coinmach Corp. v. Aspenwood Apartment Corp., 417 S.W.3d 909, 923 (Tex. 2013).

Rackspace first argues that there is no evidence that it engaged in conduct that was independently tortious. (Dkt. # 77 at 11.)  Again, "'[i]ndependently tortious' means that the conduct objected to would violate 'some other recognized tort duty.'" Star Tobacco, 298 F. Supp. 2d at 448.  "Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations . . . ." Sturges, 52 S.W.3d at 726.

Cloud49 contends that Rackspace committed fraud by making "knowing and intentional misrepresentations to DIR regarding its own capabilities." (Dkt. # 38 at 27.)  In particular, Cloud49 asserts that Rackspace's statement that "[w]ith a roster of over 3,000 Texas-based employees, we have

20

certified staff that we could transition to this project, either on a temporary or permanent basis depending on the need," is false and deceptive. (Dkt. # 82 at 7 n.34; see Dkt. # 82-1 at 89.) Cloud49 maintains that two Rackspace employees admitted in their depositions that Rackspace did not have any experience with or personnel to handle a certain portion ["CTERA"] of the Contract.[6] (Dkt. # 82 at 7l; Dkt. # 82-1 at 43, 47.) Additionally, Cloud49 provides deposition testimony from a former employee who transitioned to working at Rackspace who also stated that Rackspace did not have anyone who knew how to manage the devices involved in the CTERA portion of the Contract. (Id. at 78–79.) Given this evidence, Cloud49 argues that Rackspace's representations were false and deceptive, and therefore independently tortious. (Dkt. # 82 at 7.)

In response, Rackspace argues that no reasonable jury would interpret Rackspace's comments to mean that they had experience with CTERA. (Dkt. # 85 at 4.) Instead, Rackspace asserts that its statement concerning 3,000 Texas-based employees address's DIR's requirement in the RFO that the winner of the Contract address "[a] contingency plan that shows the ability to add more staff, if needed, to meet the Project's due date(s)." (Id.; see Dkt. # 85-2 at 3.) Furthermore, Rackspace has presented evidence that the same "contingency plan" statement was

---

[6] CTERA devices are located on site at state agencies and concern remote file programs. (See Dkt. # 82 at 7.)

made in its original bid submitted on January 8, 2020, which received a lower score, thus highlighting that Rackspace's statement could not have been the cause of the subsequent increase in Rackspace's scoring in the final round of bidding. (See Dkt. # 82-2 at 89–90 (redlined version of Rackspace's proposal) and Dkt. # 77-1 at 130 (identifying date of submission of original proposal).)

Upon consideration of the evidence, the Court finds that Cloud49 lacks sufficient evidence that Rackspace committed fraud in representing to DIR that it had sufficient staff to handle the Contract during the bidding process. Instead, as Rackspace has pointed out, its representation that it had 3,000 Texas-based employees that could transition to the project was not made in response to the CTERA portion of the Contract. The evidence indicates that the statement was made in response to DIR's request for bidders to address the "contingency plan" and was made prior to the final round of bidding upon which Cloud49 complains. Therefore, because Cloud49 has not met its burden on this element, the Court will grant summary judgment in favor of Rackspace on Cloud49's claim for tortious interference with prospective business relations.

B.    Misappropriation of Trade Secrets

Cloud49 alleges a claim under the Defend Trade Secrets Act ("DTSA"), asserting that Rackspace wrongfully acquired Cloud49's trade

secrets related to public cloud management.  (Dkt. # 38 at 23.)  Among others,

Cloud49 alleges that Rackspace hired Cloud49's former employees, inducing them

to disclose Cloud49's trade secrets in breach of NDAs and using the information to

perform under the Contract that Rackspace was awarded.  (Id.)  Although it

initially pled other bases, in its response to summary judgment, Cloud49

challenges only its alleged trade secrets related to its "book of CTERA operating

knowledge," but abandons the other categories previously alleged in its amended

complaint.  (Dkt. # 82 at 12.)  Rackspace contends that Cloud49 has no evidence to

support this claim.  (Dkt. # 77 at 16.)

   To succeed on a claim for misappropriation of trade secrets, Cloud49

must demonstrate that: "(1) a trade secret existed, (2) the trade secret was acquired

through a breach of a confidential relationship or discovered by improper means,

and (3) the defendant used the trade secret without authorization from the

plaintiff."  CAE Integrated, L.L.C. v. Moov Techs., Inc., 44 F.4th 257, 262 (5th

Cir. 2022).

   1. Existence of Trade Secret

   Under the DTSA, a trade secret includes technical designs, patterns,

plans, programs, codes methods, process, procedures whether tangible or

intangible, whether or how stored or memorialized if the owner has "taken

reasonable measures under the circumstances to keep such information secret" and

23

"the information derives independent economic value, actual or potential from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3); CAE Integrated, 44 F.4th at 262. The existence of a trade secret is a question of fact.  CAE Integrated, 44 F.4th at 262.

Cloud49 contends that it has a trade secret on the basis that its former employee, John White, developed special processes and procedures in managing CTERA devices for state agencies while employed at Cloud49.  (Dkt. # 82 at 12.) White's deposition testimony indicates that he created the processes and procedures for managing the CTERA devices from scratch while employed at Cloud49, but that he understood that Cloud49 owned the process and procedure documents that he created.  (Dkt. # 82-1 at 70.)  Additionally, White testified that no one else had access to this information, including CTERA (the manufacturer) of the devices because of White's specialized work with state agencies.  (Id. at 78, 82.)  White testified that he acquired the knowledge through trial and error, and that the information he obtained had value.  (Id. at 77–78.)

Although Rackspace presents evidence that CTERA could have figured out on its own how to provide the same support processes and procedures, and thereby arguing the information was not secret (see Dkt. # 77-1 at 42), given

Cloud49's evidence, the Court finds that it has presented sufficient evidence to create a fact issue as to whether the processes and procedures White created for Cloud49 were a trade secret. The Court will consider next consider the remaining elements required to maintain this claim.

### 2.    Acquisition and Use of Trade Secret

Regarding the second element of misappropriation of a trade secret, "[o]ne is liable for disclosure of trade secrets if (a) he discovers the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in one who is in a confidential relationship with another who discloses protected information to him." Phillips v. Frey, 20 F.3d 623, 630 (5th Cir.1994). "Improper means of acquiring another's trade secrets include theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case." Astoria Indus. of Iowa, Inc. v. SNF, Inc., 223 S.W.3d 616, 636 (Tex. App. 2007).

For the third element, "'[a]s a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use[.]'" Spear Mktg., Inc. v. BancorpSouth Bank, 791 F.3d 586, 600 (5th Cir. 2015) (quoting Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d 867, 874 (5th Cir. 2013). The Fifth Circuit also "noted that the definition of 'use'

is 'broad' and includes such activities as 'marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret.'" Id.

Cloud49 argues that Rackspace acquired the trade secret through the breach of a confidential relationship and that Rackspace has been using the trade secret up to the present day. (Dkt. # 82 at 14.) In support, Cloud49 presents evidence from Gerault, its CEO, who states that White had an obligation to keep Cloud49's information secret. (Dkt. # 82-1 at 8.) And, Cloud49 provides evidence that Rackspace hired White[7] to run its CTERA program, and White trained other Rackspace employees on the methods for running the program. (Id. at 74, 79.) Thereafter, another Cloud49 employee, Michael Hack, was also employed to White's team at Rackspace. (Id. at 76.) Cloud49's evidence indicates that while White no longer does work for Rackspace, Hack is still employed there and uses the same processes and procedures developed by White today. (Id. at 83.) Cloud49 maintains that Hack owes obligations to Cloud49 to maintain its confidential information. (Dkt. # 82 at 15.)

---

[7] Although it was unclear in the briefing, at the hearing, the parties indicated that White was actually an independent contractor who worked for a firm called Randstand after his employment with Cloud49 and was thus never actually employed by Rackpace.

In response, Rackspace asserts that Cloud49 lacks sufficient evidence that it acquired any of Cloud49's alleged trade secrets through a breach or through improper means.  (Dkt. # 77 at 17.)  Instead, Rackspace provides its own evidence that Gerault admitted in his deposition that he did not have any evidence that White, nor any other former Cloud49 employee, provided trade secrets to Rackspace.  (Dkt. # 77-1 at 30; see also id. at 43, 44, 45, 54, 62, 66, 70.)  Additionally, White testified that he did not provide any confidential information to Rackspace when he was employed solely as an independent contractor.  (Id. at 109.)  White further testified that Rackspace "had no idea what my job was," and that they "just wanted me to run it for them."  (Id.)  When asked if he believed he provided any confidential or proprietary or trade secret information to Rackspace, White testified that he was not aware of any skills he brought as trade secrets, only that he "brought [his] skill and experience along that Rackspace benefited from in support of that contract."  (Id.)

Rackspace further disputes Cloud49's evidence that Rackspace used any alleged trade secrets.  (Dkt. # 77 at 18.)  Rackspace contends that it was not in possession of any trade secrets and any information it may have had access to would have been in a transition portal maintained by DIR.  (Dkt. # 77 at 19; Dkt. # 77-1 at 93.)  Additionally, Rackspace provides evidence that Cloud49's own former Chief Production Officer testified that Cloud49's role in the transition

process was to "provide [Rackspace] information sufficient for the operation of the environment and to answer any questions." (Dkt. # 77-1 at 39.) And, when asked, he agreed that Cloud49 provided sufficient information. (Id.) Given this evidence, Rackspace argues that Cloud49 cannot now claim that Rackspace could not have performed its job under the Contract without any of Cloud49's alleged trade secrets or that it acquired Cloud49's trade secrets by improper means. (Dkt. # 77 at 20.)

Despite Cloud49's arguments and evidence, the Court does not find a fact issue exists regarding whether Rackspace acquired Cloud49's alleged trade secrets through a breach of confidential relationship or through improper means. Although Cloud49 has presented evidence that White developed policies and procedures relating to his work on the CTERA program while employed at Cloud49, the evidence does not demonstrate any breach occurred after his employment ended, or that Rackspace acquired the trade secret through any improper means. Instead, the evidence shows that White acted under the direction of Cloud49 during the transition period from Cloud49 to Rackspace, providing Rackspace with the relevant CTERA policies and procedures at issue here and while White was still employed with Cloud49. (Dkt. # 77-1 at 106–07.) Furthermore, White testified that he no longer had access to the relevant policies and procedures after his termination from Cloud49 because they were stored on a

secure Google Drive and that any documents that were shared with Rackspace happened prior to his termination from Cloud49 and during the transition process which was directed by Cloud49.

On this record, the Court finds that there is no genuine dispute of material fact as to whether Rackspace acquired any alleged trade secrets via a breach of confidential relationship or through other improper means. Given this finding, even if Cloud49 has sufficient evidence that Rackspace used, and continues to use, the CTERA processes and procedures that White developed for Cloud49, the Court declines to find that the trade secret claim should be presented to a jury. See CAE Integrated, 44 F.4th at 263 ("CAE contends that Moov could never have succeeded without CAE's data, claiming that 'the "use" of this data can reasonably be inferred from Moov's results.' This inference is insufficient to support a finding that Moov used CAE's trade secrets."); GE Betz, Inc. v. Moffit-Johnston, 885 F.3d 318, 327 (5th Cir. 2018) ("The mere fact of AmSpec's ability to compete does not itself suggest that AmSpec did so by misappropriating trade secrets."). Cloud49 has failed to present sufficient evidence to meet all elements required to maintain such a claim, and summary judgment is therefore granted in favor of Rackspace on the misappropriation of trade secret claim.

C.    Tortious Interference with Existing Contract

Cloud49 alleges a claim against Rackspace for tortious interference with existing contract "[i]n addition, or in the alternative to its trade secret misappropriation claim." (Dkt. # 82 at 21.) Cloud49 contends that Rackspace tortiously interfered with the contractual obligations of former Cloud49 employees that Rackspace hired. (Dkt. # 38 at 25.) To succeed on a claim for tortious interference with contract, Cloud49 must show that (1) a valid contract existed; (2) Rackspace willfully and intentionally interfered with the contract; (3) the interference proximately caused Cloud49 damage; and (4) Cloud49 suffered actual damage or loss. Butnaru v. Ford Motor Co., 84 S.W.3d 198, 207 (Tex. 2002). Rackspace disputes each element of this claim.

1.    Valid Contract

Cloud49 alleges that Rackspace induced White and two other employees[8] to breach their NDAs they signed with Rackspace, which prohibits the disclosure of "Proprietary Information." (Dkt. # 38 at 15–16.) However, Rackspace argues there is no evidence of an enforceable contract that is subject to interference. (Dkt. # 77 at 23.)

---

[8] In response to summary judgment, Cloud49 bases this claim only on White and does not address the two other employees. (See Dkt. # 82 at 21.)

Cloud49 argues that it required all its employees to sign confidentiality agreements, outsourcing its HR functions to obtain signatures on these agreements to a third party.  (Dkt. # 82 at 21.)  However, Cloud49 states that Cloud49 closed its business prior to filing suit in this case and did not retain copies of the signed confidentiality agreements at issue here.  (Id. at 21–22.)  Still, Cloud49 argues that it had an NDA with White, and provides evidence that White believes he probably signed such an agreement.  (Id.; Dkt. # 82-1 at 69.) Therefore, Cloud49 argues that because both parties believe there was a contract it is sufficient to proceed with this claim.  (Dkt. # 82 at 22.)  At this point, the Court must find that a fact issue exists as to whether there was a valid contract and will move on to the next elements of the claim.

### 2.    Intentional Interference

The Fifth Circuit has stated that for a tortious interference with existing contract claim, the defendant's conduct must have resulted in "some obligatory provision of a contract having been breached."  WickFire, LLC v. Laura Woodruff; TriMax Media, LLC, 989 F.3d 343, 356 (5th Cir. 2021); see also El Paso Healthcare Systems, Ltd. v. Murphy, 518 S.W.3d 412, 421–22 (Tex. 2017).  Here, because Cloud49 has failed to offer the alleged NDAs, the Court is unable to determine which provisions Cloud49 relies on to support its claim.  For

instance, the Court cannot determine how confidential or proprietary information are defined, nor an employee's obligations with such information.[9]

Even if the Court had this information and could make a determination that a fact issue exists as to whether the CTERA processes and procedures developed by White could be included as Proprietary Information in the NDA, the Court still concludes that Cloud49's evidence is lacking with regard to its allegations that Rackspace intentionally interfered in White or any of Cloud49's employees' NDAs.  "To show tortious interference, a plaintiff is not required to prove intent to injure, but rather "only that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it."  Amigo Broad., LP v. Spanish Broad. Sys., Inc., 521 F.3d 472, 490 (5th Cir. 2008) (citations omitted).

---

[9] Rackspace has produced the *unsigned* "Cloud49 Standard Non-Disclosure Agreement" between two former Cloud49 employees—David DuChene and Philip Walenta.  (Dkt. # 77-1 at 124–27.)  Those documents state that "Proprietary Information" is "information relating to various service projects and intellectual property" that *Cloud49* "has disclosed or may disclose" to the employee.  (Id. (emphasis added).)  There is no evidence that Cloud49 disclosed to White the processes and procedures; instead, the evidence indicates that it was White himself who developed this information.  Nevertheless, the agreements produced in evidence are unsigned and none of them pertain to White—the subject of Cloud49's tortious interference with existing contract claim.  The Court is cognizant of the fact that documents do not have to be admissible to be considered for summary judgment purposes.  See Lee, 859 F.3d at 355.

As discussed above, the evidence indicates that Rackspace did not induce any former Cloud49 employee to provide proprietary or confidential information to Rackspace in breach of an NDA or confidentiality agreement. Instead, the evidence shows that any alleged confidential information was sent at the behest of Cloud49 during the transition period and before White left employment with Cloud49. And, to the extent Cloud49 alleges that White utilized this knowledge while employed at Rackspace, NDAs do not prohibit a former employee from using their general knowledge, skill, and experience acquired in their former employment. See Birk v. Hub Int'l Sw. Agency Ltd., 2009 WL 10701860, at *12 (W.D. Tex. Apr. 1, 2009); see also Fleming Sales Co., Inc. v. Bailey, 611 F. Supp. 507, 514 (N.D. Ill. 1985) (noting some information an employee brings to a job "comprises general skills and knowledge acquired in the course of employment" and "[t]hose are things an employee is free to take and use in later pursuits. . . . Any other rule would force a departing employee to perform a prefrontal lobotomy on himself or herself" and "would disserve the free market goal of maximizing available resources to foster competition.").

And, even if Rackspace knew that it was industry practice to utilize NDAs, Cloud49 has not produced sufficient evidence that Rackspace intentionally interfered in these agreements. Instead, as discussed, the evidence indicates that *White* developed the CTERA processes and procedures himself and there is no

evidence that Cloud49 disclosed any of *its* Proprietary Information to White that he then was induced by Rackspace to disclose in breach of a confidentiality agreement.  (See Dkt. # 77-1 at 124–27 (stating that Proprietary Information is information *Cloud49* "has disclosed or may disclose" to an employee, and not the other way around).)  And there is no evidence that Rackspace solicited any information concerning these processes from White, only that White was hired to perform the same services he previously performed at Cloud49.  Given all of this, the Court finds a lack of sufficient evidence that Rackspace intentionally interfered in White or any other employees' NDAs to the extent they validly exist.  Therefore, because Cloud49 cannot produce sufficient evidence on all the elements, the Court will grant summary judgment in favor of Rackspace for Cloud49's tortious interference with existing contract claim.

Based on the foregoing, the Court **GRANTS** Rackspace's Motion for Summary Judgment (Dkt. # 77), and **DISMISSES WITH PREJUDICE** Cloud49's claims against Rackspace.

<u>CONCLUSION</u>

As stated above, the Court **GRANTS** Capgemini's Motion for Summary Judgment (Dkt. # 75), and **GRANTS** Rackspace's Motion for Summary Judgment (Dkt. # 77).  Plaintiffs' claims are hereby **DISMISSED WITH**

**PREJUDICE**.  The Clerk's Office is **INSTRUCTED** to **ENTER JUDGMENT**
and **CLOSE THE CASE**.

        **IT IS SO ORDERED.**

        **DATE:** Austin, Texas, April 17, 2024.

_____
David Alan Ezra
Senior United States District Judge